Case number 23-1348-07. Petro Star Inc Petitioner versus Federal Energy Regulator Commission and United States of America. Mr. Meinsinger, Petitioner of Petro Star Inc. Mr. Adoochi for petitioner as Sona Kosyoja. Miss Pot, for petitioner Zaffet Gerriegas. Mr. Ediker for the respondent. Maris Seal for the SHEPAR intervener. Morning, Mr. Meinsinger. Morning. Okay. May it please the court. Ken Meinsinger for Petro Star. Like to reserve one minute for rebuttal. In 2016, this court found there had been minimal investment in cokers in California, but the market situation has gotten much worse with California refiners now retiring cokers due to what they themselves call a low profit environment projected to continue for years to come. Given that environment, the 20% return in the Quality Bank is clearly too high. And similarly, the perpetually increasing $700 million Quality Bank investment base is also too high because among other things, it assumes California refiners are building costly new cokers instead of retiring. The Quality Bank then compounds those two errors by requiring Petro Star to pay for a costly 21st century coker, even though the Quality Bank only gives Petro Star the inferior output or yields of a less expensive 1960s coker. Incredibly, FERC even ignored the author of those yields, Mr. Geddes, who testified that the should not be used here because they are for much older cokers. Now, most of what you're about to hear from FERC and the other parties to try to justify the 20%, yes. Can I ask you about your mismatch theory? Certainly. So, you're concerned that FERC is using the capital costs of newer cokers while relying on the yields of older cokers, and there's sort of a mismatch. So, I understand that argument. But FERC says that these calculations actually reflect what's happening in the real world in terms of both yield and cost. So, even if there's sort of a theoretical mismatch, why would it be unjust and unreasonable to rely on values that essentially reflect some underlying real world reality? Because this is a real world mismatch, not a theoretical one. When you look at the evidence, there's only 14 cokers left on the West Coast. So, if petrists are disputing the fact that these numbers reflect the actual yield and cost? We agree that these numbers reflect the 12 cokers on the West Coast that are older, much older than this hypothetical coker, which was built in 2000. The two newer cokers on the West Coast have much higher liquid yields, consistent with what we've proposed. So, in fact, what FERC is doing here is actually the opposite of reality. We've paid for a newer coker, and yet we're not getting those yields. And the record shows that. The two newer cokers have yields consistent with what we've proposed and with what our other witnesses, including Getty's, have said are consistent with newer cokers. So, the two newer cokers are just, I mean, a fraction of the existing cokers. And that's right. FERC calls that cherry picking. But that's the only real apples-to-apples comparison. It's not just those two, by the way, Judge Rao. The record is very detailed, involving cokers across the world, which we cited, too, in our briefs to FERC. Now, if I could, on the 20% issue. Most of what you're about to hear to justify the 20% involves mere projections, okay, of what refiners hope to earn, not what they actually earn, and on very tiny projects, not comparable to a $700 million coker. And that's all they have in the difficult California market. We proposed using the refiners' weighted average cost of capital, which is only 7% to 9%. But that's across the industry. It's not... That's right. And that just seems like a very different enterprise. FERC found that. Well, importantly, there is no evidence of actual coker earnings on this record. Why? A coker is an integrated part of a refinery. You can't separate out the coker earnings. Or there's not access to confidential business data. It doesn't mean they couldn't separate it. They're integrated, and you really can't... You could go through some complex cost allocation, but that, frankly, would be a fool's errand. And so what you have here is FERC has tried to manufacture coker earnings in two ways. First, it's used something called hurdle rates and other projections. Hurdle rates are just what a refiner hopes to make. And by the way, those are refiner-level hurdle rates, not coker hurdle rates, okay? Those were... Let's look at one example, Phillips 66. We discussed this in our brief. It has a 30% hurdle rate, the same Phillips document, where FERC plucks this out as evidence. Phillips talks about how actual refiner earnings of it and four other major refiners are only in the 5% to 12% range, nowhere near the hurdle rates that it uses. Similar for Marathon, 20% hurdle rate. It's already retired the coker, which clearly didn't meet that hurdle rate. The court has said we can't value cuts haphazardly. What could be more haphazard? In using what a refiner hopes to make instead of what they actually do. All we have is actual returns for refiners as a whole. But what are the inputs that you're going to propose for setting this alternative cost reduction? We propose using the weighted average cost of capital, very similar to what FERC's use. It uses for pipelines and utilities like the Constellation. But how's that going to protect for inflation? Well, inflation, that is used in the formula to inflate the investment base. And that has doubled the cost of the coker to $700 million. We have a change in circumstances. No one would inflate, no one would build a new coker in California today. It's unthinkable. And the other thing, Your Honor, is in terms of inflation, the original $350 million cost of this coker, it's a sunk cost. Sunk costs, like the principle on your mortgage, do not increase. Is Petra Star basically saying, like, 20 years ago, you know, this was all reasonable, and now no one's building any new cokers, and so we just shouldn't, you know, factor in these capital costs into the pricing mechanism? We're saying, Your Honor, there have been major changes in circumstances. We are not seeking to eliminate any capital cost recovery. We're saying, instead of the 20%, you should use the- You think they want to reduce the capital cost recovery to something exceedingly low? It should be reduced to something much lower for a couple reasons. I've already mentioned no one would build a $700 million coker. That doesn't comport with reality. And the reality is we've paid for the cost of this $350 million coker more than six times already. It'll be more than 18 times if this isn't changed by 2050. And so this court has recognized, in quality bank cases and elsewhere, that a rate is subject to change circumstances. We have that in abundance here. You're treating this, though, as if it's, like, cost-of-service rate making, and it's not. It's a projection based on a very, you know, frankly problematic raw material. What is going to, you know, make it going business proposition for somebody to either build or maintain, run a coker? And so it's just an analytically- It's the cost-of-service way of looking at this. I, you know, I grant that the references to capital, it isn't about, you know, the depreciation of a capital resource. It's about what would it take for this to continue to be a going concern? Because it's not a market value. We do think you should use the weighted average cost of capital because the quality bank is based on costs. Even if you didn't do that, if you wanted to look to profits instead, something that's not rate banking, those are low, 5 to 12%. And then in terms of the investment base, Your Honor, I mean, we have to look at what has changed here. The costs have been fully recovered multiple times. It's a sunk cost. It probably should have never been increased in the first place. But particularly now that the market has changed, look at California. No one would or probably could build a coker or a coking refinery there now. So we have to- FERC says you need to reflect market reality. The market reality is that the cost of coking is much lower now. Does anybody, any major refiner endorse the 7% to 9% CFR rate? I'm sorry, Your Honor? Any major refiner endorse the 7% to 9% CRF rate, excuse me, method? Well, they haven't endorsed it, but the 7% to 9% weighted average cost of capital is determined by third-party financial analysts, the same ones that used to set returns in pipeline and electric utility cases, the CAPM model. So the refiners haven't endorsed it, but the information is based on third-party objective estimation of what those capital costs are, Your Honor. If I could just make one point about remedy. I guess- Sure. I mean, it is Petrostar's burden to show that the existing rate is unjust and unreasonable. And we feel like- Not just to say that, like, a different rate that would also be just and reasonable. Agreed. But we feel like we've done that. The 20% is higher than either the cost of capital or actual refiner profits. There are no such thing as coker earnings. I want to say one thing about the coker earnings they've manufactured. It's important. They rely on a proprietary- two proprietary models. FERC has no idea the basis for those models. And in fact, FERC's own staff rejected them for that reason. The alleged coker margins also disregard two of this court's opinions. They're relying a significant part on the price of fuel oil, which this court rejected in Oxy and in Exxon. They also continue to rely on margins that exclude capital costs. They have not sufficiently explained that. Platts says they exclude capital costs. And finally, and this is really important, those three reasons are enough to reject these alleged margins. But the fourth reason, they allocate all the incremental profit of a coking refinery to one unit, the coker, and ignore what they themselves in their order in discussing the anomaly say are these other units of the coker. Look at paragraph 35 of the order. They say it's the other units that take the intermediate coker products and turn them into real valuable gasoline and jet fuel. They don't allocate any of the profit to those units at all. So these alleged margins, they're just completely overstated. Thank you, Eric. Good morning, Mr. Ducci. Steve, when you're ready.  Steve Ducci on behalf of ConocoPhillips. I'd like to reserve one minute. The proper functioning of the quality bank depends on assigning accurate relative values to the nine ANS crude oil cuts. And the quality bank's goal is to assign a value to each cut reflecting its actual price as closely as possible. For the resid cut, there's no published market price, so it needs to be reverse engineered. You take the product yields that result from the coking, and you subtract from that the coker processing costs, which are made of fixed and variable operating costs and the coker capital costs. The coker capital costs are derived by the CRF, the coker refining factor. That factor is developed as the type of financial return or cash flow that refiners will typically require to invest in a coker. It's designed to reflect earnings, an earnings metric similar to EBITDA, earnings before interest tax depreciation and amortization. Because the CRF is premised on earnings and expected financial returns, the only way to properly assess the reasonableness of the CRF is to look at the actual market-based evidence showing earnings, margins, and hurdle rates that the market is currently requiring to invest in a coker-type project. Here, FERC got it exactly right when it said Petrostar had failed to meet its burden to show that the CRF should be reduced, because it looked extensively at that market-based data. The critical error here is that every piece of that market data that they used to reject Petrostar's analysis was never brought to bear on our analysis. Paragraph 178 is the entirety of the analysis saying that ConocoPhillips did not meet its burden. Yet, the record and the agency itself in its findings indicate and show that that's a false premise. For example, the presiding judge's ID at paragraph 146, Penn site JA0470471, specifically found that ConocoPhillips' witnesses justified a Quality Bank CRF of well over the current 20%. Well, the fact that ConocoPhillips has shown that another rate might be just and reasonable doesn't also mean that FERC's rate is unjust and unreasonable. So those things aren't necessarily equivalent, right? You can have a—I mean, we have lots of cases saying that, you know, the just and reasonable rate doesn't—I mean, whether those are—you know, you may disagree with them, but, you know, the most accurate rate just has to be just and reasonable. Correct. And we have to show that it's unjust and unreasonable. That's correct. And part of that here is that the Quality Bank puts the responsibility on FERC to show that it—and get the value as close as to the market value as possible. For instance— Where does it say that it has to be as close to the market value as possible? Is that the only thing that would be just and reasonable? Yes. Your last order in Petrostar v. FERC also indicated that. And from the very beginning, the Quality Bank's goal is to get the value as close as to the market value as possible. Maybe we should just have the private market then figure it out. We have market pricing. No FERC pricing at all. Well, actually, FERC's not pricing it, right? We are looking at the market. For all but three of those cuts, you're looking at publicly posted market prices. For RISD, you have to pull it back and reverse engineer it. And here, every CRF in the record that was based on the market-based evidence is above 20%. Which means— I thought the cash flow model from the trial staff was a CRF of 22.26. 22.26. And that's 11% higher than the original 20%. And we calculated that. FERC did not dispute any of our calculations on the record. That's a $29 million over-recovery annually. And that cash flow analysis, we actually looked at, and we said, it's artificially low because of certain problems with the input to that. But FERC never addressed those questions. But they also have certain estimates from 15% to 30%. I mean, there's some inexactitude given the lack of the precise data that one would want. And that this has to be reconstructed based on models and inferences have to be made. So are you arguing that the difference— you are arguing, I gather, the difference between the 20% and the 22.25% is arbitrary and capricious because it's unexplained? We believe that's unexplained because, again, that overvalues the RISD value by $29 million annually. But more importantly, it's the fact that all of the evidence that FERC used to reject Petrostar's argument was never brought to bear on our question on whether it should be increased. They only referenced one cash flow analysis. Now, if you could, look at page 20 of our opening brief. And it's a graph. It's the very first graph. And that depicts exactly what our problem is here. And I'll let you get that out before I talk about it. Now, that may have some confidential information, but I am not going to talk about any of the confidential information. I'm just going to explain what this graph is showing. Do you all have it? Okay. So if you look near the left, there's a current methodology of 20%. That's the current quality bank methodology. And that's the current CRF. And what ConocoPhillips witnesses did, everything to the right of that, that's the market-based evidence in the record. They're hurdle rates. They're internal rates of return. They're the margin data from PLATS, the margin data from IHS, all converted to CRF so that you can look at it on an apples-to-apples basis. All of that information to the right of the 20%, FERC relied on to dispel the inappropriate claims of Petrostar that the capital recovery factor should be reduced. And that's to the left of the 20%. All of the evidence to the right was never even brought to bear on whether the CRF should be increased, simply the 22.26%. FERC just simply says, on balance, we haven't met a burden. On balance actually requires a balancing. And right now you've got the 22.26 and the 20, but they completely ignore all of the rest of the market-based evidence they found reliable. Market-based evidence? How much of that is based on proprietary information that can't be verified? I would say that it can't be verified. You can verify. FERC can verify. They can subpoena it, and they did. So they can verify that data. And those, like, for instance, internal rates of return, those are the AFEs that you see there, where they're listed as AFEs, where you're seeing hurdle rates. Those are public. And remember, a company, let's say, like, the record has Valero's evidence publicly. They're building a $1 billion Coker, and their hurdle rate is roughly, I believe, 25%. That's public. They're telling their investors they're going to invest a billion dollars because they think they can get that 25%. That's not an ask for, you know, some type of a wing and a prayer. These things are, hurdle rates are actually well-thought-out, gated plans. The record has a DOJ and EIA study, which specifically says, yes, it's ordinary to use hurdle rates to make these investments and to look at them and qualify them and decide on them, and that, for the most part, you're within 5%. But my question here is, in looking at whether it should be increased, FERC needed to actually balance that and actually apply the evidence. It did balance. It considered your claims, and it considered, you know, what would it mean to wholesale rely on hurdle rates, projected earnings. You know, FERC decided that's inappropriate, and moreover, wouldn't, if FERC adopted the 30% CRF that you proposed, that would undercut some of the responses that FERC relied on to Petrostar's argument. So it's taking people, you know, challenging from all sides, and doing what it thinks is the best with all the different criticisms that it's getting. However, Your Honor, I don't believe that's correct, and I believe that FERC is drastically inconsistent. As I was saying, if you look at Opinion 588, and it's Paragraph 143, JA Site 62, they cite ConocoPhillips' witness, Flesker, demonstrated that CRFs derived from flats, West Coast, earnings, far exceeded Quality Bank's CRF of 20%. Then Commission found, again, relying on ConocoPhillips' evidence, and this is Paragraph 144, in Site JA 6263, and they quote, the record includes extensive testimony that refiners are recovering coking margins above the current per barrel CRF of slightly under $10. Again, citing ConocoPhillips' witness of the Laughlin and Flesker. And finally, at Opinion 58, at Paragraphs 155 and 171, JA Site 68, 69, and 77, they cite ConocoPhillips' evidence showing that West Coast cokers historically had higher CRFs and earnings than the Quality Bank coker. This inconsistency is arbitrary and capricious. They have yet to actually apply and to address the question whether it should be increased based on the market-based evidence, which their own staff said was 22.26, which is higher. I'd say I'm over. Yeah. All right. Thank you. Thank you. We'll hear from Nipah. Good morning, Your Honor. May it please the court. Amy Hoff on behalf of the TAPS carriers. The issue of whether the administrator violated Section 3G5 of the tariff is not a question of whether the TAPS carriers have complied with or violated the filed rate doctrine, which is how FERC has attempted to portray this. This is purely an issue of tariff interpretation. And in this case, there is only one reasonable interpretation of Section 3G5, and that is that the administrator will monitor the common stream through periodic testing, but that he will replace the resid values that are set forth in the tariff only if he determines that there is a significant change that will have an impact on the value of resid. And I will note that this is the interpretation that the administrator has applied without difficulty for almost 20, the almost 20 years. Does the tariff say there has to be a significant change?  Is that just the understanding? Is that actually in the tariff? It is in the tariff, Your Honor. I'm sorry. Can you give me a second? Yes. If you look at, it's in, I think the language is set forth in the initial decision, and that's in JA 0554. And I will note this is an excerpt of Section 3G5. It's not the entirety of the section, but the first sentence that you see in the quoted section, which is in paragraph 375, it states that the Quality Bank Administrator shall have the discretion to retest let's see, when he believes that there may be a change in the common stream that will, and I quote, significantly affect the resid component unit value. So the word significantly is in fact set forth in the tariff. But then we have, so isn't this the provision is under the prospective tariff amendment that once the Quality Bank Administrator elects to retest that that should all be taken into account. So the significance kind of drops away. Your Honor, that is certainly how FERC is interpreted, right? Is that the discretion, the Quality Bank Administrator's discretion only comes into play after, right? His only discretion is whether to test or not to test, right? And if he does test, then under FERC's interpretation, then he is required to use those test results. But I will say that interpretation, I think, is inconsistent with the totality of section 3G5, primarily because I think if you focus on the second sentence of this excerpt, which FERC has done, it effectively reads the first sentence out of existence, right? In other words, it sets aside the Quality Bank Administrator's discretion to do anything. And from a practical perspective. I understand that argument, though, because the significantly effect goes to whether... So the administrator, for some reason, believes that there might be a significant change. And so he elects to test. And so that second test section, sorry, the second sentence seems to be the one that's relevant to what he then has to do once he has elected to test. The issue, Your Honor, is a practical one. And that is that, right, so the Quality Bank Administrator has been tasked with monitoring the common stream. I think that's very clear if you look back at the 2004 initial decision, which was the genesis of the section of the tariff. And the issue is that the only way the Quality Bank Administrator can monitor, right, the only way he can have any idea whether or not there has been any change in the common stream is to test. You can't look at the crude oil and decide, okay, the resid values have changed. You have to test in order to make the initial determination of, okay, is there a reason to think that the results may have changed? I mean, what you say makes a lot of sense, you know, in terms of, well, we're not going to, we shouldn't update the formula unless there has been some kind of real change. But that just doesn't seem to be what the tariff says. And Your Honor, I think certainly the tariff is not, right, the tariff is not perfect. It isn't, right, it isn't. I will say, however, that I think at least for the last nigh on, you know, 20 plus years, the Quality Bank Administrator has interpreted the tariff in exactly this way. He submitted a memo in 2006 at the time that the Section 3G-5 was implemented, indicating that he was doing monthly testing and that he would continue to monitor the common stream, right, and so this has been the interpretation for almost 20 years until this issue was raised by Petrostar. And the formula wasn't updated during that time. The, well, what's in the tariff is the 2001, the resid properties that are set forth in the 2001 Caleb Brett assay. And so the idea was, right, and if you, again, if you go back and look at the 2004 initial decision, that they were going to use the 2001 Caleb Brett assay as a starting point going forward until someone decided, until, not someone, the Quality Bank Administrator determined that there had been a significant change. And so that was supposed to be the starting point. There was going to be continuous monitoring, right, that was going to be done through periodic testing, and that can be seen, I believe, in paragraphs 1147 of the 2004 initial decision. And it was only then, after the Administrator had made a determination that there, in fact, had been a significant change, that there would be a subsequent, right, a subsequent formal retest and the values would be updated. So has the volatility in the resid properties made these individual monthly tests unreliable with respect to a pricing model? Yes, Your Honor, and in fact, that is actually what the Commission itself found. If you look at paragraphs 79 and 80 of Opinion 588, and that's in, let's see, that's the Joint Appendix 36 and 37, that's specifically what the Commission found. What the Commission said. So they found there that, as described in the record, the current tariff language in Section 3G-5 places the Administrator in a no-win situation that leads to unjust and unreasonable results. And then in the rest of that paragraph, they talk about all of the problems with using the results of the monthly tests. And set forth in the original initial decision, not the 2004 initial decision, but the initial decision in this case, there are a number of graphs that begin on approximately paragraph, let's see, that it begins on approximately JA, let's see, JA 545. And they show the 2001 Kayla Brett assay as compared to the results of the monthly tests. And they show the volatility. And that's what FERC is referencing when they're talking about this in paragraphs 79 and 80 of Opinion 588. And have you all conducted any kind of, like, independent audits to determine the financial impact with respect to noncompliance? Your Honor, I'm not aware of that. I will say, Brent, that the CAHPS carriers and the Quality Bank Administrator administered the Quality Bank on behalf of the shippers and have no financial, we have no financial stake in this. And so, no, as far as I know, that analysis has not been done. That's a big picture question. I'm just not sure how, you know, following your logic, wouldn't it mean that shippers can ignore the text of the tariff if they have an analysis showing that it leads to unjust results? Like, how can it be enforced in the meantime? I'm not sure I fully understand your question, Your Honor, but in terms of how the tariff can be enforced, again, so I think what the Quality Bank Administrator has done and what he was tasked with in the 2004 initial decision was to perform, we're going to start with the 2001 Caleb Brett assay, we're going to monitor the common stream, right, to see if something, see if anything changes that is going to significantly impact the value of RESID. And again, the only way he can do that is through testing. And so the Quality Bank tests the common stream on a monthly basis. They look at the RESID, right, they look at the RESID results and, you know, the RESID results, they do vary, right, significantly on a monthly basis due to differences, you know, difference in the equipment at the lab, differences in the lab technician, there's sometimes just a lack of precision. And so what the, and this is in the record, but the Quality Bank Administrator was looking for overall trends. In other words, is there a significant change in one direction, right, in one direction or another that is sustained, a sustained trend? And if so, then the Quality Bank Administrator would take, would follow Section 3G5 of the tariff, say I've identified a change that will have an impact on the value of RESID, and then update those properties in the tariff. And so I think if, I don't know if that answers your question, Judge, but I think that's how they will, right, that's how someone can ensure that, again, that the goal of the tariff is met, which is to ensure that the values that the Quality Bank Administrator uses for RESID are appropriately reflective of the values that are in the common stream. So I would just like to point out that I think it is, right, FERC acknowledges in Opinion 588 that they have put, their interpretation of the tariff has put the administrator in a no-win situation. And if you look, you can see that, again, in paragraphs 79 and 80. You're wrapping. Oh, I'm sorry. Yes, Your Honor, I am. I will simply say, right, that I think FERC's interpretation contradicts basic principles of tariff interpretation that are set forth in the cases that are cited in our brief, as well as the cases that are cited by the Commission. And based on that, we think their interpretation is illogical. And what you think the no-win situation is for the administrator? Oh, yes. So the no-win situation is, and again, I think this is what FERC is talking about in paragraph 80 where they say this. The issue is that what they've said is that, okay, we recognize that the tariff requires you, right, that the tariff requires you to monitor the common stream. And we recognize that the only way you can monitor the common stream is through periodic testing. But the language of your tariff also says that if you monitor and if you do testing, then you must use the results of those tests, even if those results are not representative of the common stream and therefore not just unreasonable. So I think FERC acknowledges that it's a no-win situation for the administrator because we're going to violate the law on one hand by failing to follow the tariff. But if we were to follow the tariff, then that would also equal a violation, right, of the Interstate Commerce Act because we would be using test results that were not just unreasonable and therefore applying an unjust and unreasonable evaluation to revisit. Does TAP, I mean, have they thought a revision of the tariff? No, Your Honor. There's been, well, playing back up. There certainly, right, the tariff has- There's also an option, right, if it seems to produce strange results in a no-win situation- The tariff has- One possibility is to petition FERC to change the tariff. The tariff has now been revised, right, in the wake of Opinion 588. However, again, for 20 years since the tariff was put in place in 2006, this is how it was administered and no one thought that it was producing unjust and unreasonable results. In other words, I recognize that in the opinion, FERC says, well, if it- Or I'm sorry, in their brief, FERC says, well, you know, if it's producing unjust and reasonable results, then you can ask to modify it. But I think it wasn't producing unjust and unreasonable results because even as FERC recognizes, the use of the 2001 Caleb Rett assay continued to be representative and so produced a just and reasonable evaluation of revisit during that period. And so there was, under the tax carrier's interpretation, there was no reason to seek a change to the tariff. All right. Thank you, Your Honor. May it please the court. I'm Scott Edgar, hearing for the Federal Energy Regulatory Commission. Thank you for hearing this case this morning. This case is primarily about the valuation of resid. No party, neither Petrostar nor ConocoPhillips has demonstrated that the, that has demonstrated sufficient evidence to show that the methodology used to value resid is results in an unjust and unreasonable result. Rather, the commission found, looking at the record as a whole, that the tariff accurately reflects the market value of resid and it is just and reasonable. I would like to start with, briefly with the yield issue. And I'd like to point this court to two particular paragraphs that I think are very key to this issue. The first one is the paragraph 53 JA 25. What specific yield issue are you talking? The yield, the base yields. And this will be wrapped up with the mismatch theory and all that. And where I'd like to start is with paragraph 53, where the commission makes clear that the name of the game here is to get at the, to mimic the typical West Coast poker. My friends for Petrostar would like us to look at particular, what they consider high performing cokers. And if I can diverge this for a second, the commission doesn't even buy that premise because the commission notes that it's a lot more complicated than that. And that the newest cokers are not necessarily more productive than the oldest ones. But setting that aside for a second, the real important key here that we're after is to mimic the typical West Coast coker. What Petrostar suggests wouldn't get to that. They would only look at certain cokers. And we can't be sure that the crude oil is actually gonna go to those cokers. This crude is going to go to the entirety of the West Coast coker. So that would actually create a problem if we were to adopt that theory. The second paragraph I would like to highlight is the actual facts of how the base yields reflect what's actually happening on the West Coast coker market. That's paragraph 54 at JA27. The commission relies on the testimony of Flesner at page 125 and 127 to 133. And this is at JA2516 and 2518 to 24, who looked at eight West Coast cokers. And also the testimony of Rutgert at pages 54 to 58 and 60 to 65. JA1648 to 50 and 31, 32 to 38 and 1651 to 52. And Rutgert looked at 12 cokers. Both of them concluded that the West Coast coking market has yields that are very close to what the base yields are in the tariff. So the actual mismatch I would argue would be to embrace Petrostar's theory of using particular cokers that they think are high-performing. So would you say that the mismatch is only theoretical and not a real world mismatch? Is that one way to understand it? It is definitely not real world mismatch. And certainly I would rely on paragraph 54 and the commission's findings in that paragraph. So there is no mismatch. And this ties into the theory about sunk costs and all of that. And I think both of them are consistent with the commission. Both of those theories are consistent. We're using base yields that exist today. And we're also using a capital cost that is consistent with today's dollars. We started with a base 2000 and the commission reasonably has applied the indexing to that base in order to bring those costs, capital costs up to today's dollars. And in fact, as we pointed out in our briefing, at times that has actually gone down. So we're just matching the prices. But does it differentiate based on technological improvement? I would say it does account. First of all, again, the commission disagreed that the new COCRs are actually any better and that any technological advancements actually are available to any COCR. And the commission made that finding. But then again, I would go to paragraph 54 and that the base yields, again, are actually the same as the COCRs. Very close, very close to what's going on in the West Coast market. Thanks for the tax carriers argument. Yes. And the tariff interpretation there. What would be your response to Ms. Hoff's arguments? The response is, I have a couple of points. Clearly the commission said it's a no-win situation for the administrator. But the commission also said, I would point out Judge Rao to 176. And this is to paragraph 81 at JA37. And the administrator didn't have to do any testing. And so this gets to your point. This argument seems a little, I mean, the administrator is seeming to want to diligently monitor the composition of the stream. And was doing so for many years on a monthly basis. That does seem like something that the administrator maybe was required to do or in the diligent exercise of his duties was performing. Fair enough, Your Honor. And I appreciate it. I don't think that the commission meant to indicate that the administrator wasn't diligent. This is just a disagreement about what this tariff means. I think my response is at the end of the day, the proper thing to do would have been to amend this tariff earlier. So I asked her about that and she said, well, nobody, I mean, this was just what was being done and no one suggested that it was inappropriate. So there was no reason to try to modify the tariff after so many years of sort of constant practice. I'm not sure that's an answer because that no one thought to comply with the tariff. I'm not sure that's an answer. I think at the end of the day, we want compliance with the tariff and all the commission has done here. And I think Your Honor sees, in particular, the second sentence of the relevant language here. And it's pretty clear that once a test is made, that it shall be incorporated. And I think the volatility that could occur in that situation, if that had been a problem, I think that the proper response would have been to amend the tariff. So I think what's your response to Ms. Huff's assertion that there's almost like a circularity built into those two sentences of the tariff, because the only way that the Quality Bank Administrator can tell if there's been any changes to test. So it's not like there's a reason to believe there's been a change and then testing goes on. And the reason to believe has to be that there's been a significant change. She's asserting there's no such information unless and until you test. And therefore, the substantiality qualifier has to apply to the results as well. I guess I would make a few points. I would go back to the footnote that says the- It doesn't test at all. It wouldn't have to test at all. That's number one. And then number two is there could be a lapse of time. If there isn't testing and then a year goes by or something like that, that might be reason. Your Honor is searching for a reason to test without a test. And so a lapse of time in that circumstance might be a reason to do a retest. And then the second sentence of that tariff is very clear. Once that's done, it shall be used in the tariff. And I also want to point out one other thing. And I think all parties agree that the testing here is just as credible. It's reliable. There's no suggestion that it was some sort of informal test or anything like that. And this is paragraph 74 at JA34. It's more that it can be variable. And so FERC has resolved that by doing that. Right. In paragraph 79 to 82, JA36 to 38, the commission did amend the tariff to somewhat codify the existing practice of monthly testing, but then do an annual update, which would address the volatility issue. The annual updating is now part of the new tariff? Yes. Significant or substantial or not? Yes. Could I back up and go to, I'm going to make it just a few points on the CRF and in particular, ConocoPhillips. And I think I just want to highlight what the commission has done in paragraph 178 and highlight some of the, what the commission meant when it looked at the record as a whole. And I just want to emphasize that this is a very long record that a lot of our witnesses, the hearing was very long. The Judge Hurt, she did a very thorough and excellent evaluation of all the evidence and the commission had to grapple with all that. My friends for ConocoPhillips would like us to hone in on their particular evidence, but there was more than that. There was this commission staff, Zachary records, cashflow analysis, which resulted in a CRF that was 2.26, very close to the existing just unreasonable rate. And it bears mentioning as well that it is the burden on the proponent of a change to first demonstrate that the existing rate is not just unreasonable. Why not just go for 22.26? That's been demonstrated to your satisfaction. And they point out that there's a non-trivial difference between that and 20%. Judge Pillard, there's much more than that. There's the hurdle rates. There's, and I also want to make a reference to the WAC, to the weighted average cost of capital. Sorry for that acronym. And the commission said in footnote 423 at JA82 that the weighted average cost of capital is one source of data. And it also said that it was outweighed by hurdle rates and earnings. And also at paragraph 169 at JA74, the commission said that the weighted average cost of capital provides some information. And then again, at paragraph 171, JA77, the weighted average cost of capital is one data point. So the commission did not entirely dismiss this evidence. So there's a staff witness record. There's the weighted average cost of capital. There's hurdle rates. So circle back, Judge Pillard, to your question. Why didn't the commission just go with that one data point? And I believe the answer is there's so much more out there. And the commission explicitly said that when it referred to the extensive record and it was making a decision here on balance, and that's in paragraph 179 at JA81. It's a little analytically unsatisfying because it's sort of, you know, I mean, you can see where kind of the book's coming from. You're using these arguments against Petrostar, but then sort of saying, yeah, but there's a lot of static in here. So we're going to stick with 20%. I think these are difficult. I think this is a difficult issue. And I think the volume of paper that we're dealing with in this case, I think that speaks to the grappling that the commission did and Judge Hurd did with this case. And- I just got the answer that the information about how much is actually spent on coking is proprietary information. I mean, so all this reconstruction of actual costs to come up with a- This engineered market price, is it because of proprietary information? Well, it's an integrated process. I think that must make it very difficult, but I can turn to, I mean, the commission addressed the Platts data and the commission found it credible. And the commission considered Petrostar's arguments, trying to turn to those pages. And I think the commission is entitled to deference on that question. There's a lot of papers of FERCWIN. I would refer your honors to paragraph 158, and this is JA 70. And it's referring to both the Platts data and the IHS data. And they say they're well-known data aggregators and the commission, and I think it's entitled to deference on this, said that their margins data is a useful metric for analyzing earnings. Thank you, your honor. And lastly, we hear from Shipper Intervenors. Ms. Marcille? I pronounce it Marcel. Marcel, thank you. Thank you, your honor. And good morning. Lori Marcel for the Shipper Intervenors. I have a couple of points to make, but I like to start by just responding to a few of the questions and comments that have been made so far. And I believe early on, there was a question about market prices and how do we know this is supposed to be based on market prices? And that is a very well-established precedent with respect to the quality bank. I think Mr. Adichie referred to the fact that this court in its remand order said that the quality bank, the values assigned to each of the quality bank cuts are supposed to mirror market prices as closely as possible. And that principle goes all the way back to this court's decision in Oxy in 1995. And in our brief at footnote seven, we have a string site where there, we cite a lot of the precedent. And so the FERC has always tried to apply those principles as has this court. Mr. Meinsinger was talking about, and they've made a lot of claims in their briefs about how much they've paid and they've paid for this COCR so many times allegedly. But FERC ruled correctly because FERC saw this for what it was. And FERC said, even if that's true, the COCR continues to add value and there needs to be a charge for that processing because you really need to go back and remember what's going on here. So Petrostar is taking the crude oil out of tax. It's taking what it wants out of that crude oil and it's rejecting what it, and it's turning what it doesn't want into the common stream, right? And that includes a lot more resid. And it's in here saying, basically, we shouldn't have to pay for that. We're gonna make that reside all the other shippers problems. So to be fair, we should pay less for that. Well, we should pay 10 cents a barrel. That's what they're saying. So almost nothing, right? So that's what they're saying. And that's what's important. That's what you have to remember here. And there was never any expectation when this 20% capital recovery factor was adopted back in the days of Judge Silverstein and his order in 2000, that this was gonna expire, okay? And the initial decision points this out at paragraph 115, 109, and 231. Because at the time Judge Silverstein adopted it in 2004, it was retroactive to 1993. And so at that point in time, the COCR already would have been paid for multiple times over. And nobody including Petrostar argued then, wait a minute, we shouldn't have to pay for this. In fact, Petrostar supported the 20% CRL. How do we think about though, the real world fact that they have suggested that no new COCRs are really being built or very few. These are things that are, they've been built a long time ago and that's a market reality as well. Well, the commission found correctly that, well, I mean, all that means is that the West Coast has the capacity it needs for COCR. I mean, there are 14 COCRs on the West Coast. So is that a lot? Yeah, I mean- Is that good? Is that a lot of COCRs? I mean- And Petrostar suggested, oh, well, there have been a couple of conversions to renewable fuels and things along those lines. And they just take the fact that that's happened without any actual evidence and say, oh, well, that means COCRs aren't valuable. There is evidence in the record and we cite to it in our brief and the initial decision and it's a joint appendix 2605. And in our brief, we cite to it at note 41 where we actually got through a subpoena. We got some evidence and the commission relies on it about what the causes were for those conversions and it wasn't the COCRs. So you cannot look at evidence of some conversions or the fact that COCRs aren't being built to say, oh, well, it's not valuable. Nobody's paying for COCR anymore because that is not true. In fact, the commission found very reasonably, there were a lot of witnesses that testified to this, including Petrostar's own expert witness on COCRs, Mr. Romero, testified that COCRs are valuable. They are adding a lot of value because they're taking RISD, which is literally the bottom of the barrel and they're turning it into valuable products. Coking's expensive and COCRs provide a very valuable service. The fact that the initial decision found correctly that the fact that some COCRs are no longer in service only makes the other COCRs more valuable. That's what witness Lito testified to and that's what the judge pointed to. But if the RISD value is really low, you know, based on market data. Well, it has no value until it's coked into saleable products. But who's bearing the cost of that? Who's bearing the cost of? Well, it has to be converted by a COCR into saleable products. And so that's what we're doing here is that's how it's valued because there's no market price for it. You work backwards. You start at the price of the saleable products and then you have to deduct the cost of coking. This court has found that the cost of coking must be deducted in order to get all the cuts on an equal basis. Usually it has, she says it's low value and you say, well, it has no value. It has no valuation. The whole project here is figuring out what its value is. Right. In and of itself before it's coked, right, it doesn't have a market price. But once it's- It's never had a negative value or a pre-processing or a zero value. I think some value is just not enough. Well, there was a time because through the history of the reserve valuation cases that have come before this court and we've been litigating about this a lot for many years where it can be, if you need to sell it or dispose of it, it has to be blended with fuel oil. But this court said a while ago, that's not an acceptable way to value it. That is way too inaccurate. We're not gonna accept that. Go back and do it again. So I'd like to go a little bit to the mismatch point. That is a true red herring.  Because first of all, when Petrostar says we're paying for a newer coker, what they point to is equipment that Judge Silverstein added to make this a modern coker because Petrostar is quoting this language from Judge Silverstein's order saying, we're gonna make this a modern coker. We're gonna bring these costs forward from 1996. And there's equipment that I wanna add to make this a modern coker. Well, it was demonstrated and the commission relies on this as did the judge. And Petrostar's own witnesses admitted that none of that equipment increases yields. So whether it's a newer coker or not a newer coker, that equipment doesn't increase yields. And the fact of the matter is, and FERC did rely on that, yes. If I have, I have it here. Okay. What does it mean to increase yields though? Well, when you add that equipment, it's not the kind of equipment that's gonna enable the coker to produce what Petrostar is saying is, a modern coker is producing more liquid, more of the valuable liquid yields. And none of the equipment that was added, that Judge Silverstein added to the coker to make it a modern coker would have the effect. It was mostly for safety or environmental reasons or things like that. Not anything that would increase yields. And in fact, Mr. Luca, who both the judge and the commission site, he was cooking expert that we sponsored, testified that, and Mr. Flessner as well, and Petrostar's witnesses agreed that cokers operate to maximize, refiners and cokers, to maximize profitability. And that isn't always the same thing as maximizing yields, right? And there are many reasons that a coker or a refiner would not operate as coker at maximum level to just get increased yields. Because as the commission found, the incremental yields that you're gonna get are not as valuable. And there are detrimental effects to your coker for running it that way, purely for the purpose of increasing yields. So it's a little more complicated than Petrostar would have you believe. All right. Unless you have another point, we're ready to wrap up. Okay. Yeah, I would like to just wrap up by saying, and I think this is something that, well, I know that my colleague, Mr. Edinger touched on, but FERC conducted a very thorough review here. It was a nine week hearing, 17 expert witnesses. When the court remanded this case, it identified a limited set of issues pertaining to the capital recovery factor for FERC to revisit. And FERC actually broadened its scope of review. It broadened its scope of review to include things that Petrostar didn't even appeal, like the yields issue. And it made a very thorough and sound, well-reasoned decision that the capital recovery factor and the yields, the yields continue to accurately be reflected in the PIMS yields and that the capital recovery factor should not be reduced below 20%. Thank you for your time. I appreciate your indulgence going over. Thank you. And now we have some short rebuttal. I think Mr. Meinfeger had reserved one minute. Just have a few quick points, Your Honor. First, Ms. Marshall said, resid has no value until it's processed. Even if it's crude oil, you have to process it. You can't just put crude oil in your car. Second, Judge Rao, you asked Mr. Adichie about, I think, whether there was any visibility into the models. There is no visibility into the models at all that are used to construct these artificial COCR margins. FERC has no idea how they're calculated. That's why its staff disavowed those margins. There were subpoenas for some of that proprietary information? I don't believe there were subpoenas for that information. Someone mentioned that the Quality Bank is based on market prices.  Actual market prices for cuts like propane and butane. Not projections. There's lots of projections out there for the price of propane. We don't use those. We use actuals. If they had the analogous market prices for the bottom three cuts, I'm sure they would be. Yes. But we're in a different situation. We are, but... The point is that we're not doing cost and service breakmaking. We're projecting a margin. And that's fine, Your Honor. But the 22.6 that you mentioned is based on purely projections, not actuals. And staff's own testimony, it's based on four hurdle rates, the average. Staff's own testimony says those are rarely achieved, citing the EIA and other evidence. They're rarely achieved. Much lower returns are achieved in reality. And so if anything, the hurdle rates are only substantial evidence of whatever fire would hope to earn. We can't base the Quality Bank on that any more than we would base, you know, let FERC get away with some other judgment about something that doesn't comport with reality. Like whether there's a need for a pipeline in New Jersey or not. A need for what? A pipeline in New Jersey. There was a case, Judge Shiles is nodding. But, you know, FERC said there was a need for this pipeline. And you looked at the evidence. You didn't let it get away with that. There's a study there in New Jersey that says, no, we don't need a pipeline. And so we deal with actuality here, not just broad brush. The reality here is that refiners are closing refineries in California. Ms. Marcell mentioned the conversions. Two major refineries have been converted to renewable fuels. When that happens, the coker's gone. It's not earning a thing. The refinery still is, though, processing soybeans or something. But that shows, if anything, the 7% to 9% whack is generous. But Judge Rao, you had a question earlier about how low Petrostar's calculated value is. But that only goes to remedy, specifically more about the investment base. If the court thinks our remedy is too low, we talked about several alternatives. One would be the original $350 million rate base to go back to that. Because clearly, you don't inflate a sunk cost and circumstances have changed. If you think our proposal is too low, it's not a justification for the $700 million investment base, which is completely out of whack with the reality of this market, whether you use cost-based analysis to look at this or more of a market realities standard. Last thing I would say is, Mr. Ettinger said that we're trying, the yields are reflective of a typical West Coast coker. Fine, we agree. But the quality bank coker isn't typical. It costs $350 million to construct. The typical coker was built in the 60s for less than 100 million. We're not getting what we paid for. And that's just unjust and unreasonable. Thank you, Your Honors. Thank you very much. The case is submitted. Oh, I'm so sorry. There was one more. Did you also have, okay, we have a couple of minutes here. Thank you, Your Honor. And thank you, Tetra. To comment on what a good argument did in your primary. First, I'd like to say Petrostar 853 F3 at 100 is the reference to as close to the market as possible. And that's citing Oxy 64 F3 at 693. Mr. Rucker talked about cashflow analysis 22.26. On our brief, we specifically point out that it's basically this pattern in dealing with ConocoPhillips arguments. We specifically challenged the legitimacy of the 22.26. We said it was artificially low. We challenged specific inputs to that cashflow model. That was on a brief on exceptions. Trial staff did not oppose those exceptions. On opinion 588, it doesn't address them at all. It just didn't address them at all. So the 22.26 has to have a checkmark by it. We believe it's artificially low. And we believe our arguments to that will go directly to whether the CRF should be increased. Because if they're relying on the 22.26, and that's actually what, as we showed, if you corrected it, equals more like 30%. That goes directly to our argument. Next, Council for FERC staff said hurdle rates. As a reference to, hey, look at the hurdle rates in relation to the CRF. You got to remember that a hurdle rate is not a CRF. Hurdle rate is an expected return. The CRF is a cashflow analysis where you look at what is an investor looking for. It's an imitative value. It's a recovery of your investment, on your investment and income taxes. They're two separate things. You can convert a hurdle rate into a CRF, and then you can compare the CRF based on those hurdle rates. That's what we did on page 20 in that graph. Mr. Edgar also said, and told you, PLAS IHS data margin was very good data. And it was well done. He forgot to tell you that that's ConocoPhillips witness that he's relying on. And that data showed, as I indicated in my early arguments, that you could justify a CRF much higher than the 30%. It's just beyond my imagination where staff and FERC can say, we're relying on your data to show that a CRF can be justified much higher than 20%. And then turn around and say the same data that you just presented, that doesn't meet your burden to show that it should be higher than 20%. That doesn't make any sense. Lastly, he said that this case is complicated and it's large. But just because the case is complicated and large doesn't allow you to do arbitrary and capricious things like not apply evidence to the issue. And lastly, I would note for you all, about two and a half weeks ago, this court issued a case in Cigar Association v. FDA, case number 23-5220, 2025 Westlaw. 286514, strikingly similar to this case, where this court reinforced the fact that if you base your decision on a false premise, it's gonna be found arbitrary and capricious. And if you don't apply the relevant evidence to the question, including when you're choosing between options, you're gonna be found arbitrary and capricious, thank you. Thank you. Ms. Haas. Yes, thank you, Your Honor. So the commission is advocating an overly literal interpretation of Section 3G5 that defeats the intent of the tariff. And that is contrary to case law. That includes the National Van Lines case, as well as the Pennsylvania Central case that are cited in our briefs. The intent of Section 3G5, just like the intent of the 2004 initial decision, was to have the Quality Bank Administrator monitor the common stream, right, through testing, and then only update the values that are used to value reside if he determined in his discretion that there had been a significant change. Under Mr. Edinger's interpretation, apparently, right, we can do nothing, right? But if the Quality Bank Administrator had actually done that, then that would violate the intent and the spirit of Section 3G5. It's not the specific letter of the tariff itself. And I will just note that if a tariff is subject to different constructions, that which is reasonable and consistent with the purpose of the tariff is preferred to the one that is impractical or leads to absurd consequences. Thank you. Thank you. I believe now the case is submitted.
judges: Pillard; Rao; Childs